Brent M. Karren (State Bar No. 291038)
Kristi L.K. Young (State Bar No. 247404)
**MANNING GROSS + MASSENBURG LLP**
201 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 512-4381
Facsimile: (415) 512-6791
bkarren@mgmlaw.com
kyoung@mgmlaw.com

Jason G. Blilie (*Pro Hac Vice* Admission Pending)
Craig R. Lewis (*Pro Hac Vice* Admission Pending)
**BLILIE LAW**
350 Lincoln Road, Second Floor
Miami Beach Florida 33139
Telephone: (786) 490-6045
jason@blilielaw.com
craig@blilielaw.com

*Attorneys for Plaintiffs*

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SBC BERLIN 2012-2014, LTD., CR INVESTMENTS & MANAGEMENT UG (haftungsbeschraenkt), and SEMYON DUKACH,<br><br>Plaintiffs,<br><br>vs.<br><br>BABYWATCH, INC., SANDRO MUR, URSKA SRSEN, and BELLABEAT, INC.,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL** |

The Plaintiffs, SBC BERLIN 2012-2014, LTD., CR INVESTMENTS & MANAGEMENT UG (haftungsbeschraenkt), and SEMYON DUKACH, sue the Defendants, BABYWATCH, INC., SANDRO MUR, URSKA SRSEN, and BELLABEAT, INC., and state:

**JURISDICTION AND VENUE**

1.      SBC Berlin 2012-2014, Ltd. ("Startupbootcamp") is a foreign limited liability company organized under the laws of England and Wales with its principal place of business

1

located in Berlin, Germany. Startupbootcamp has 14 owners, who are citizens of Germany, Denmark, United Kingdom, Switzerland, Singapore, and the State of Massachusetts. Startupbootcamp is not a Citizen of California; and no owner thereof is a citizen of California.

2.      CR Investments & Management UG (haftungsbeschraenkt) is a foreign corporation organized under the laws of Germany with its principal place of business located in Frankfurt, Germany. CR Investments & Management UG is not a Citizen of the State of California.

3.      Semyon Dukach is an individual who is domiciled in, and is a citizen of, the State of Massachusetts

4.      BabyWatch, Inc. is a corporation organized under the laws of Delaware with its principal place of business located in Mountain View, California.

5.      Sandro Mur is an individual who is a citizen of Croatia.

6.      Urska Srsen is an individual who is a citizen of Slovenia.

7.      Bellabeat, Inc. is a corporation organized under the laws of Delaware with its principal place of business located in San Francisco, California.

8.      The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1)-(3) because this is a suit between citizens of California and of foreign states on one side and citizens of another State and of other foreign states on the other side and because the amount in controversy exceeds $75,000.00 exclusive of interest, fees, and costs.

9.      The Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because this complaint includes a federal claim and other claims so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

10.     The Court has personal jurisdiction over the Defendants because the Defendants have minimum contacts with the United States as a whole and the State of California; and the litigation arises out of or is related to the Defendants' contacts with the forum.

11.     Venue lies in the United States District Court for the Northern District of California under 28 U.S.C. § 1391 because Defendants BabyWatch and Bellabeat reside in Mountain View

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

and San Francisco, California respectively and the other defendants are not residents of the United States.

**GENERAL ALLEGATIONS**

12.     Startupbootcamp operates a startup accelerator program that provides certain resources including but not limited to access to an international network of mentors, service providers, potential clients and customers, and capital investment to early-stage startups and founders in order to accelerate the growth of the business. Startupbootcamp also receives the ability to invest in the startups that participate in its accelerator program.

13.     Prior to the institution of this action, Defendants Mur and Srsen approached Startupbootcamp with an idea for a health monitor that would allow expecting mothers to monitor their babies' heartbeats *in utero*. Srsen and Mur signed a document at that time acknowledging their and BabyWatch's duties to Startupbootcamp in connection with their involvement with the accelerator.

14.     In August 2013, BabyWatch was incorporated under the laws of Delaware. In the articles of incorporation, the incorporator was listed as:

Sandro Mur
Startupbootcamp c/o BabyWatch (Urska Srsen)
Charlottenstraße 2
10969 Berlin
Germany

Mur signed the articles of incorporation. The Certificate of Incorporation authorized the issuance of up to 10,000,000 shares of common stock at the time of incorporation. BabyWatch was registered with the California Secretary of State in May 2014. Its principal address in California was listed as 280 Easy Street, #307, Mountain View.

15.     As part of its services to BabyWatch, Startupbootcamp introduced BabyWatch to several early stage investors and mentors, including Plaintiff Semyon Dukach and Helen Yuanyuan Cao, who is an owner and director of Plaintiff CR Investments & Management UG (haftungsbeschraenkt) (Dukach and CR Investments & Management UG (haftungsbeschraenkt) are collectively referred to as the "Early Stage Investors").

3

16.     The Early Stage Investors contributed their own valuable efforts, professional advice, and experience to the Defendants, and eventually each of the Early Stage Investors entered into separate Convertible Promissory Note Purchase Agreements and Convertible Promissory Notes with BabyWatch. A copy of Dukach's Convertible Promissory Note Purchase Agreement is attached hereto and incorporated herein as Exhibit 1. A copy of Dukach's Convertible Promissory Note is attached hereto and incorporated herein as Exhibit 2. A copy of CR Investments & Management UG (haftungsbeschraenkt)'s Convertible Promissory Note Purchase Agreement is attached hereto and incorporated herein as Exhibit 3. A copy of CR Investments & Management UG (haftungsbeschraenkt)'s Convertible Promissory Note is attached hereto and incorporated herein as Exhibit 4. Through their respective agreements, Dukach invested USD$30,000, and CR Investments & Management UG (haftungsbeschraenkt) invested USD$20,000. The Convertible Promissory Notes, and/or the Early Stage Investors' interests in BabyWatch resulting therefrom, are securities.

17.     Under the Convertible Promissory Notes, if BabyWatch was sold or if another qualified financing event occurred, the debt owed to the Early Stage Investors by BabyWatch as a result of the Convertible Promissory Notes would convert to equity in accordance with the applicable conversion terms.

18.     In October 2013, Startupbootcamp purchased 800,000 shares of BabyWatch via a written Common Stock Purchase Agreement. A copy of the Common Stock Purchase Agreement is attached hereto and incorporated herein as Exhibit 5. The purchase price was EUR 15,000. BabyWatch did not issue stock certificates in connection with the Common Stock Purchase Agreement. The Common Stock Purchase Agreement, and/or Startupbootcamp's interests in BabyWatch resulting therefrom, are securities.

19.     Several events occurred prior to the maturity dates of the Convertible Promissory Notes that potentially constituted qualified financings or a sale of BabyWatch. Specifically:

　　　　a.     Around June of 2014, the Defendants raised $4.5 million dollars for Bellabeat;

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

LAW OFFICES OF

MANNING GROSS + MASSENBURG LLP

b.    Sometime in 2015, the Defendants raised additional funds of an unknown amount at an unknown business valuation;

c.    At some point in time unknown to the Plaintiffs, Defendants Mur and Srsen caused BabyWatch to transfer all of its assets to Bellabeat[1] (a company that they formed, controlled, and on information and belief own), without any consideration paid to BabyWatch and without any of the other BabyWatch shareholders, equity stakeholders, or creditors (including the Plaintiffs) being made aware of the transfer or receiving anything of value; and

d.    In 2018, Bellabeat raised $14.5 million in venture capital at a supposed business valuation of $70 million, utilizing the assets and business model of

---

[1] Bellabeat's technology and its business model are the same as, or simply derivatives of BabyWatch's. Bellabeat was formed in August 2014 under the laws of Delaware, and registered in California in August 2016 at the address 16 Merced Avenue, San Francisco. Mur signed the registration as an officer of Bellabeat. At some point, BabyWatch's website directly forwarded to Bellabeat's:



INTERNET ARCHIVE
WayBackMachine

Loading...

    https://www.babywatchome.com/ |
    11:18:06 March 25, 2014

    Got an HTTP 301 response at crawl time

Redirecting to...

    http://www.bellabeat.com/

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

BabyWatch actually assigned its rights to its trademarks and related goodwill to Bellabeat, with Mur signing the assignment for both parties. The assignment is registered with the USPTO. In fact, Bellabeat is a mere alter ego of BabyWatch, Mur and Srsen; and/or Bellabeat and BabyWatch *de facto* merged such that Bellabeat should be liable for the debts and obligations of the other Defendants as described herein.

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

BabyWatch.

Each of these events constitutes the sale of securities.

20.     None of the foregoing events were made known to the Plaintiffs at the time of their occurrence; in fact, despite numerous inquiries by the Plaintiffs into the status of BabyWatch and their rights under their respective agreements, the existence of these qualifying events was intentionally concealed from, and in many instances fraudulently misrepresented to, the Plaintiffs by BabyWatch, Mur, and Srsen. No uniform investor updates were sent to the Plaintiffs. Some of them received information regarding monies raised by Mur and Srsen, but none of them was informed that fundraising was occurring under a different corporate entity, and no one was notified that steps would need to be taken to protect their interests with regard thereto.

21.     Assuming the investment round referenced in paragraph 19(a) above to be accurate, Startupbootcamp's shares were worth at least $360,000, and, assuming a conversion of the notes, common shares in BabyWatch in the amount contemplated by Dukach's Convertible Promissory Note would have been worth at least $135,000;[2] and common shares in the amount contemplated by CR Investments & Management UG's Convertible Promissory Note would have been worth at least $59,000.

22.     Assuming the valuation referenced in paragraph 19(d) above to be accurate, the ownership interest in Bellabeat that Startupbootcamp claims a right to would be worth roughly $5.6 million, the ownership interest in Bellabeat that Dukach claims a right to would be worth roughly $2.1 million; and the ownership interest in Bellabeat that CR Investments & Management UG claims a right to would be worth roughly $933,000.[3]

23.     Notwithstanding, and despite demanding enforcement of their rights under their

---

[2] The Early Stage Investors contend that they are entitled to preferred shares or shadow preferred shares, which would be significantly more valuable than common shares.

[3] The numbers referenced in paragraphs twenty-one and twenty-two are not meant to be a precise measure of the Plaintiffs' damages. A precise measure cannot be made based on the information the Plaintiffs have been given, because the Plaintiffs were prevented from participating in the decisions that resulted in or resulted from the referenced financing events and the specific details thereof were at all material times, and continue to be, hidden from the Plaintiffs. Early stage investors typically expect, and the Plaintiffs in this case expected, to receive special rights in connection with their investments, given the risks associated therewith. They bargained for, among other things, preemptive rights that allow participation in future funding events to mitigate dilution of their ownership percentages. The Plaintiffs were not allowed to do so by the Defendants.

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

1
2

respective agreements, the Plaintiffs have not received the agreed-upon consideration thereunder, any return on their respective investments, or anything of value from the Defendants.

3
4
5
6

24.    The Defendants took active steps independent of their original fraud and actions to cover up the conduct that gives rise to this complaint and their fraud continued well after their original misconduct.

25.    At all material times, Mur and Srsen controlled Babywatch and were complicit in its actions.

7
8
9
10

26.    The Plaintiffs have been required by the Defendants' actions to engage the undersigned to file this lawsuit to enforce the Plaintiffs' rights, and are required to pay the undersigned a reasonable attorney's fee.

11
12

**COUNT I – SECURITIES FRAUD UNDER 15 U.S.C. § 78j(b) AND 17 C.F.R. § 240.10b-5**
**(All Plaintiffs vs. BabyWatch, Mur, and Srsen)**

13
14

The Plaintiffs reallege and reincorporate herein the allegations contained in paragraphs 1 through 26 above, and further state:

15
16
17
18
19
20
21
22

27.    Mur and Srsen, individually and on behalf of BabyWatch, made material misrepresentations or omissions in connection with the Plaintiffs' purchase or their sale of securities. Specifically, Mur, Srsen, and BabyWatch made material misrepresentations that they intended to notify the Plaintiffs of qualified BabyWatch financings, sales, or mergers, sufficient to allow the Plaintiffs to benefit from their rights and interests in BabyWatch at the time they executed the Common Stock Purchase Agreement and the Convertible Promissory Notes; and Mur, Srsen, and BabyWatch made material omissions as to the status of BabyWatch, the financing events, and the transfer of BabyWatch assets to Bellabeat at the time of those events.

23
24
25
26
27

28.    Mur, Srsen, and BabyWatch's conduct in making these material misrepresentations and omissions was intentional or willful; and they acted with reckless disregard of a substantial likelihood of misleading investors, specifically including the Plaintiffs. Mur, Srsen, and BabyWatch actively concealed their conduct from the Plaintiffs for some time after committing their material misrepresentations and omissions, and the Plaintiffs did not learn of these material

28

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

misrepresentations and omissions until well after Mur, Srsen, and BabyWatch committed them.

29.     The Plaintiffs made investment decisions, including the decisions concerning their purchase into BabyWatch and the decisions as investors at the time of the transfer of the assets of BabyWatch to Bellabeat, in reliance on the fraudulent misrepresentations and omissions of Mur, Srsen, and BabyWatch, who each had duties to the Plaintiffs to disclose BabyWatch financing events, sales, and mergers to the Plaintiffs.

30.     The Plaintiffs' reliance was reasonable.

31.     The actions of Mur, Srsen, and BabyWatch actually did cause losses to the Plaintiffs. Disclosure of the foregoing information that Mur, Srsen, and BabyWatch omitted or misstated to the Plaintiffs caused a drop in the value of the Plaintiffs' securities once disclosed.

## COUNT II – BREACH OF CONVERTIBLE NOTE
### (Early Stage Investors vs. BabyWatch)

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1 through 26 above, and further state:

32.     The Convertible Promissory Notes constitute valid and enforceable agreements between the Early Stage Investors and BabyWatch.

33.     The Early Stage Investors performed all of their duties under the Convertible Promissory Notes.

34.     BabyWatch breached the Convertible Promissory Notes, causing the Early Stage Investors damage.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (All Plaintiffs vs. Mur and Srsen)

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1 through 26 above, and further state:

35.     Startupbootcamp's ownership of stock, and the Early Stage Investors' status under the Convertible Promissory Notes, gave rise to fiduciary duties from Mur and Srsen, as officers and/or directors of BabyWatch, to the Plaintiffs.

36.     Mur and Srsen breached their fiduciary duties to the Plaintiffs, including by (i)

causing BabyWatch's assets to be transferred to Bellabeat, to their personal benefit as Bellabeat shareholders, without the Plaintiffs receiving appropriate consideration, (ii) failing or refusing to notify the Plaintiffs of the transfer from BabyWatch to Bellabeat, or of the interest in Bellabeat the Plaintiffs should have received as a result of that transfer, (iii) failing or refusing to provide notice of the various funding rounds, and (iv) continuing to operate Bellabeat and benefiting from the growth and development thereof.

37.     Mur and Srsen's breach of their fiduciary duties caused damage to the Plaintiffs.

38.     Mur and Srsen had a personal interest in the subject matter of the actions described above and did not act in good faith.

### COUNT IV – VOIDABLE TRANSFER – CAL. CIV. CODE § 3439.04(a)(1)
### (All Plaintiffs vs. All Defendants)

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1 through 26 above, and further state:

39.     The Plaintiffs are creditors of BabyWatch.

40.     BabyWatch transferred its assets to Bellabeat with actual intent to hinder, delay, or defraud creditors, including the Plaintiffs. The following badges of fraud, among others, are present:

     a.    The transfer or obligation was to an insider;

     b.    BabyWatch retained possession or control of the property transferred after the transfer;

     c.    The transfer or obligation was concealed;

     d.    The transfer was of substantially all BabyWatch's assets;

     e.    BabyWatch removed or concealed assets;

     f.    The value of the consideration received by BabyWatch was not reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred; and

     g.    BabyWatch was insolvent or became insolvent shortly after the transfer was

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

1

2          made or the obligation was incurred.

3          41.    The transfer was made for the benefit of Bellabeat, Mur, and Srsen, and each of

4   them received value as part of the transfer.

5          **COUNT V – VOIDABLE TRANSFER – CAL. CIV. CODE § 3439.04(a)(2)**
           **(All Plaintiffs vs. All Defendants)**

6          The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1

7   through 26 above, and further state:

8          42.    The Plaintiffs are creditors of BabyWatch.

9          43.    BabyWatch transferred its assets to Bellabeat without receiving a reasonably

10  equivalent value in exchange, and BabyWatch either was engaged or was about to engage in a

11  business or a transaction for which its remaining assets were unreasonably small in relation to the

12  business or transaction, or intended to incur, or believed or reasonably should have believed that it

13  would incur, debts beyond its ability to pay as they became due.

14         44.    The transfer was made for the benefit of Bellabeat, Mur, and Srsen, and each of

15  them received value as part of the transfer.

16         **COUNT VI – VOIDABLE TRANSFER – CAL. CIV. CODE § 3439.05**
           **(All Plaintiffs vs. All Defendants)**

17

18         The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1

19  through 26 above, and further state:

20         45.    The Plaintiffs are creditors of BabyWatch whose claims arose before BabyWatch

21  transferred its assets to Bellabeat.

22         46.    BabyWatch transferred its assets to Bellabeat without receiving a reasonably

23  equivalent value in exchange for the transfer and BabyWatch was insolvent at that time or became

24  insolvent as a result of the transfer.

25         47.    The transfer was made for the benefit of Bellabeat, Mur, and Srsen, and each of

26  them received value as part of the transfer.

27  ///

28  ///

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

1
2

## COUNT VII – NEGLIGENT MISREPRESENTATION UNDER CAL. CIV. CODE § 1710
### (All Plaintiffs vs. BabyWatch, Mur, and Srsen)

3

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1

4

through 26 above, and further state:

5

48.     Mur, Srsen, and BabyWatch had a particular duty to provide accurate information

6

to the Plaintiffs about BabyWatch's business, based on Plaintiffs' pecuniary interest in that

7

information.

8

49.     Mur, Srsen, and BabyWatch supplied to Plaintiffs false material information and

9

made material omissions, including the information concerning the rounds of funding described

10

herein, and the transfer of assets or de facto merger of BabyWatch and Bellabeat.

11

50.     Mur, Srsen, and BabyWatch had no reasonable ground for believing their

12

representations were true when made yet intended that the Plaintiffs rely on their representations.

13

51.     The Plaintiffs reasonably and justifiably relied on the false information

14

communicated by Mur Srsen, and BabyWatch and sustained pecuniary loss as a direct and

15

proximate result of such reliance.

16
17

## COUNT VIII – FRAUDULENT CONCEALMENT UNDER CAL. CIV. CODE § 1710
### (All Plaintiffs vs. BabyWatch, Mur, and Srsen)

18

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1

19

through 26 above, and further state:

20

52.     Mur and Srsen, in their individual capacities and for their individual benefits, and in

21

their capacities as officers or directors of BabyWatch, deliberately concealed material information,

22

including the rounds of funding described herein, and the transfer of assets or de facto merger of

23

BabyWatch and Bellabeat. Mur, Srsen, and BabyWatch made partial representations and concealed

24

material facts and thus had a duty to fully disclose facts in order to prevent the statements they

25

actually made from being misleading. In addition, Mur and Srsen, as directors and officers of

26

BabyWatch, owed a duty to Plaintiffs, as BabyWatch investors and stockholders, and had a duty to

27

refrain from any act that breached the trust reposed in them.

28

53.     Mur, Srsen, and BabyWatch had exclusive knowledge of the concealed material

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

MANNING GROSS + MASSENBURG LLP
LAW OFFICES OF

facts and the Plaintiffs did not know and could not reasonably be expected to know of these facts.

54.     Mur, Srsen, and BabyWatch knew or had reason to know that the information they concealed was material, but they continued to purposefully and actively conceal material information to induce Plaintiffs' reliance. Due to the fraud the Defendants perpetrated, additional information regarding Mur, Srsen, and BabyWatch's knowledge is peculiarly within the Defendants' knowledge and control.

55.     The Plaintiffs reasonably and justifiably relied upon Mur, Srsen, and BabyWatch's material misstatements and omissions.

56.     Mur, Srsen, and BabyWatch's concealment was a substantial factor in causing the Plaintiffs harm.

**COUNT IX – UNLAWFUL BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200**
**(All Plaintiffs vs. All Defendants)**

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1 through 26 above, and further state:

57.     The Defendants engaged in unlawful business practices by committing fraudulent concealment and negligent misrepresentation, by making statements to the Plaintiffs that were materially false, and by failing to disclose information that made other statements materially misleading. The Defendants' business practices were immoral, unethical, oppressive, unscrupulous, and caused injury to consumers, including but not limited to the Plaintiffs, and the gravity of their conduct outweighs any alleged benefits attributable to such conduct. The Defendants' business practices violate public policy because they directly implicate the public interest by impacting matters of great importance to the public.

58.     The Plaintiffs have suffered injury in fact and have lost money as a result of the Defendants' unlawful, fraudulent, and unfair conduct.

**COUNT X – DECLARATORY JUDGMENT UNDER 22 U.S.C. § 2201**
**(All Plaintiffs vs. Bellabeat)**

The Plaintiffs re-allege and reincorporate herein the allegations contained in paragraphs 1

COMPLAINT FOR DAMAGES AND FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

through 58 above, and further state:

59.    This count seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 that Bellabeat, BabyWatch, Mur, and Srsen are alter egos of each other and that each Defendant should be liable for the debts and obligations of BabyWatch and the other Defendants.

60.    Based on the events that took place, the Plaintiffs believe that there is a unity of interest and ownership between BabyWatch, Mur, Srsen, and Bellabeat, and it would be unfair if the acts described in this complaint are treated as those of Babywatch alone. Specifically:

    a.    The Defendants commingled funds and other assets, failed to segregate funds of the separate entities, and diverted corporate funds or assets to other than corporate uses;

    b.    Mur and Srsen treated BabyWatch's assets as assets of their own and of Bellabeat;

    c.    The Defendants failed to follow corporate formalities, including maintaining records, holding board or shareholder meetings, or having officers;

    d.    BabyWatch and Bellabeat share owners, directors, and officers; share employees and/or attorneys; and conduct the same business;

    e.    The Defendants used BabyWatch and Bellabeat as a shell or as an instrument for a single venture;

    f.    The Defendants concealed or misrepresented the identity of the responsible ownership, management and financial interests of BabyWatch and Bellabeat;

    g.    The Defendants used the corporate entity to procure labor, services, and funding for themselves and the other corporations;

    h.    Mur and Srsen diverted assets from BabyWatch by or to themselves and Bellabeat, to the detriment of creditors;

    i.    The Defendants manipulated assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another.

61.     Based on the events that took place, the Plaintiffs believe that Bellabeat is liable to the Plaintiffs to the same extent BabyWatch is liable to the Plaintiffs. Specifically:

a.      Bellabeat expressly or implicitly agreed to assume the liability of BabyWatch to the Plaintiffs;

b.      The transactions between BabyWatch and Bellabeat amounted to a consolidation or de facto merger;

c.      Bellabeat was merely a continuation of BabyWatch;

d.      The transactions between BabyWatch and Bellabeat were fraudulently entered into to escape liability; or

e.      The transfers between BabyWatch and Bellabeat were without adequate consideration and no provisions were made for creditors of BabyWatch, including the Plaintiffs.

62.     The Plaintiffs have demanded that the Defendants recognize their rights and interests in Bellabeat based on the foregoing, but the Defendants have failed or refused to do so.

63.     An actual justiciable controversy between the Plaintiffs and the Defendants exists within the meaning of 28 U.S.C. § 2201 regarding whether Bellabeat, BabyWatch, Mur, and Srsen are alter egos of each other and that each Defendant should be liable for the debts and obligations of BabyWatch and the others.

## **DEMAND FOR RELIEF**

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment in their favor and against the Defendants, as follows:

A.      Awarding the Plaintiffs damages in the amount of their ownership interests in BabyWatch and Bellabeat, including consequential damages, punitive damages, and disgorgement of ill-gotten profits or gains, in an amount to be determined at trial;

B.      An order declaring that Bellabeat is the alter ego of BabyWatch or that Bellabeat and BabyWatch de facto merged;

C.      An order requiring the Defendants to pay both pre- and post-judgment interest on

LAW OFFICES OF
MANNING GROSS + MASSENBURG LLP

any amounts awarded;

D.     An order awarding the Plaintiffs attorney's fees on all causes of action for which

attorney's fees are recoverable; and

E.     Such other and further relief as the Court deems equitable, just, and proper.


DATED: December 19, 2018                    **MANNING GROSS + MASSENBURG LLP**



By: */s/ Brent M. Karren, Esq.*
        Brent M. Karren
        Kristi L.K. Young
        Attorneys for Plaintiffs

# DEMAND FOR JURY TRIAL

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO ALL PARTIES HEREIN:

PLEASE TAKE NOTICE THAT Plaintiffs SBC BERLIN 2012-2014, LTD., CR INVESTMENTS & MANAGEMENT UG (haftungsbeschraenkt), and SEMYON DUKACH hereby demand a trial by jury in the above-entitled action and estimate that the length of trial will be four to six weeks in duration.


DATED: December 19, 2018          **MANNING GROSS + MASSENBURG LLP**


By: */s/ Brent M. Karren, Esq.*
       Brent M. Karren
       Kristi L.K. Young
       Attorneys for Plaintiffs

# Exhibit 1

## CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT (the "*Agreement*") is made as of September the 20th, 2013 (the "*Effective Date*") by and among [BabyWatch, Inc.] a Delaware corporation (the "*Company*"), and Semyon Dukach (the "*Purchaser*").

### RECITAL

A.    To provide the Company with resources to conduct its business, the Purchaser is willing to loan to the Company $30,000 (the "*Loan Amount*"), subject to the conditions specified herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and the Purchaser, intending to be legally bound, hereby agrees as follows:

1.    **AMOUNT AND TERMS OF THE LOAN**

**1.1The Loan**.    Subject to the terms of this Agreement, the Purchaser agrees to lend to the Company the Loan Amount against the issuance and delivery by the Company of a convertible promissory note for such amount, in the form attached hereto as EXHIBIT A (the "*Note*").

2.    **CLOSING AND DELIVERY**

**2.1Closing.**    The closing of the sale and purchase of the Note (the "*Closing*") shall be held on the Effective Date, or at such other time as the Company and Purchaser may mutually agree.

**2.2Delivery.**    At the Closing (i) the Purchaser shall deliver to the Company a check or wire transfer funds in the amount of the Loan Amount; and (ii) the Company shall issue and deliver to the Purchaser a Note in favor of the Purchaser payable in the principal amount of the Loan Amount.

3.    **REPRESENTATIONS, WARRANTIES THE COMPANY**

The Company hereby represents and warrants to the Purchaser as of the Closing as follows:

**3.1Organization, Good Standing and Qualification**.[1]    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The

---

1

Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business.

**3.2 Corporate Power**. The Company has all requisite corporate power to execute and deliver this Agreement, to issue the Note (collectively, the "*Loan Documents*") and to carry out and perform its obligations under the terms of the Loan Documents.

**3.3 Authorization.** All corporate action on the part of the Company, its directors and its stockholders necessary for the authorization of the Loan Documents and the execution, delivery and performance of all obligations of the Company under the Loan Documents, including the issuance and delivery of the Note and the reservation of the equity securities issuable upon conversion of the Note (the "*Conversion Securities*") has been taken or will be taken prior to the issuance of such Conversion Securities. The Loan Documents, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of the Loan Documents will be validly issued, fully paid and nonassessable and free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

**3.4 Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of the Company in connection with the valid execution and delivery of this Agreement, the offer, sale or issuance of the Note and the Conversion Securities issuable upon conversion of the Note or the consummation of any other transaction contemplated hereby shall have been obtained and will be effective at such time as required by such governmental authority.

**3.5 Compliance with Laws**. The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Company.

**3.6 Compliance with Other Instruments**. The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violations that would not individually or in the aggregate have an adverse effect on the Company. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated by the Loan Documents will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving

2.

of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.   The sale of the Note and the subsequent issuance of the Conversion Securities are not and will not be subject to any preemptive rights or rights of first refusal that have not been properly waived or complied with.

**3.7 Liabilities**.   The Company has no material liabilities and, to the best of its knowledge no material contingent liabilities, except current liabilities incurred in the ordinary course of business which have not been, either in any individual case or in the aggregate, materially adverse.

**3.8 Offering.**   Assuming the accuracy of the representations and warranties of the Purchaser contained in Section 4 hereof, the offer, issue, and sale of the Note and the Conversion Securities (collectively, the "*Securities*") are and will be exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "*Act*"), and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

**3.9 Use of Proceeds.**   The Company shall use the proceeds of sale and issuance of the Note for the operations of its business, and not for any personal, family or household purpose.

**3.10 Full Disclosure.**   To the Company's knowledge, there are no facts which (individually or in the aggregate) materially adversely affect the business, assets, liabilities, financial condition, prospects or operations of the Company that have not been disclosed in writing to the Purchaser.

**4.**     **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

**4.1 Purchase for Own Account**.   The Purchaser represents that it is acquiring the Securities solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**4.2 Information and Sophistication**.   Without lessening or obviating the representations and warranties of the Company set forth in Section 3, the Purchaser hereby: (i) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and (ii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**4.3 Ability to Bear Economic Risk**.   The Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**4.4Further Limitations on Disposition**.  Without in any way limiting the representations set forth above, the Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

**(a)**There is then in effect a Registration Statement under the Act covering such proposed disposition and such disposition is made in accordance with such Registration Statement; or

**(b)**The Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

**(c)**Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by Purchaser to a member (or retired member) of Purchaser in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchaser hereunder.

**4.5Accredited Investor Status.**  The Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**5.     MISCELLANEOUS**

**5.1Binding Agreement**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.   Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**5.2Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

**5.3Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.4Titles and Subtitles**.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**5.5Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at the address on the signature page below, and to Purchaser at Semyon Dukach 81 Westbourne Ter Brookline MA 02446 USA or at such other addresses as the Company or Purchaser may designate by 10 days advance written notice to the other parties hereto.

**5.6Modification; Waiver**.  No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective only upon the written consent of the Company and the Purchaser.  Any provision of the Note may be amended or waived by the written consent of the Company and the Purchaser.

**5.7Expenses.**  The Company and the Purchaser shall each bear its respective expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein.

**5.8Delays or Omissions.**  It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Purchaser, upon any breach or default of the Company under the Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by Purchaser of any breach or default under this Agreement, or any waiver by any Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

**5.9Entire Agreement.**  This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT as of the date first written above.

COMPANY:

BABYWATCH, INC.

By: _____

Name: Sandro Mur_____

Title: CEO_____

Address:

One Commerce Center - 1201 Orange St. #600
Wilmington
New Castle County
Delaware 19899

366743 v2/CO

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT as of the date first written above.

**PURCHASER:**

**SEMYON DUKACH**

By:
Name:_____
Title:_____

EXHIBIT A

FORM OF CONVERTIBLE PROMISSORY NOTE

# Exhibit 2

THIS CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE HOLDER SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

## CONVERTIBLE PROMISSORY NOTE

$30,000                                          Date: September the 20th, 2013

For value received **[BabyWatch, Inc.] a Delaware** corporation (the "*Company*"), promises to pay to **[SEMYON DUKACH]** or its assigns ("*Holder*") the principal sum of $30,000 together with accrued and unpaid interest thereon, each due and payable on the date and in the manner set forth below.

This convertible promissory note (the "*Note*") is issued pursuant to the terms of that certain Convertible Promissory Note Purchase Agreement (as amended, the "*Agreement*") dated as of September the 20th, 2013.

**1.Repayment.**  All payments of interest and principal shall be in lawful money of the United States of America.  All payments shall be applied first to accrued interest, and thereafter to principal.  The outstanding principal amount of the Loan shall be due and payable on the two year anniversary of this Note (the "*Maturity Date*").

**2.Interest Rate.**   The Company promises to pay simple interest on the outstanding principal amount hereof from the date hereof until payment in full, which interest shall be payable at the rate of 5% per annum or the maximum rate permissible by law, whichever is less.  Interest shall be due and payable on the Maturity Date and shall be calculated on the basis of a 365-day year for the actual number of days elapsed.

**3.Conversion; Repayment Premium Upon Sale of the Company.**

**(a)**In the event that the Company issues and sells shares of its Equity Securities to investors (the "*Investors*") on or before the date of the repayment in full of this Note in an arms-length equity financing resulting in gross proceeds to the Company of at least $500,000 (excluding the conversion of this Note and any other debt) (a "*Qualified Financing*"), then the outstanding principal balance of this Note shall automatically convert in whole without any further action by the Holder into such Equity Securities at a conversion price equal to the lesser of (i) 80% of the per share price paid by the Investors or (ii) the price equal to the quotient of $1,000,000 divided by the aggregate number of shares of the Company's Common Stock on a fully diluted basis as of immediately prior to the initial closing of the Qualified Financing.  At the option of the

366742 v2/CO

Holder, the Holder will receive all of the benefits afforded to the Investors in the Qualified Financing.  Any unpaid accrued interest on this Note shall be converted into Equity Securities on the same terms as the principal of this Note.

**(b)**In the event that a Qualified Financing is not consummated prior to the Maturity Date, then, at the written election of the Holder made at least five days prior to the Maturity Date, effective upon the Maturity Date, the outstanding principal balance and any unpaid accrued interest under this Note shall be converted into shares of Common Stock of the Company at a conversion price equal to the quotient of $1,000,000 divided by the aggregate number of outstanding shares of the Company's Common Stock as of the Maturity Date (assuming full conversion or exercise of all convertible and exercisable securities then outstanding other than this Note).

**(c)**If the conversion of the Note would result in the issuance of a fractional share, the Company shall, in lieu of issuance of any fractional share, pay the Holder otherwise entitled to such fraction a sum in cash equal to the product resulting from multiplying the then current fair market value of one share of the class and series of capital stock into which this Note has converted by such fraction.

**(d)**Notwithstanding any provision of this Note to the contrary, if the Company consummates a Sale of the Company (as defined below) prior to the conversion or repayment in full of this Note, then (i) the Company will give the Holder at least five days prior written notice of the anticipated closing date of such Sale of the Company and (ii) at the closing of such Sale of the Company, in full satisfaction of the Company's obligations under this Note, the Company will pay the Holder an aggregate amount equal to the greater of (x) the aggregate amount of principal and interest then outstanding under this Note or (y) the amount the Holder would have been entitled to receive in connection with such Sale of the Company if the aggregate amount of principal and interest then outstanding under this Note had been converted into shares of Common Stock of the Company pursuant to Section 3(b) immediately prior to the closing of such Sale of the Company.

**(e)**For purposes of this Note:

**(i)**"*Equity Securities*" shall mean the Company's capital stock or any securities conferring the right to purchase the Company's capital stock or securities convertible into, or exchangeable for (with or without additional consideration), the Company's capital stock, except that such defined term shall not include any security granted, issued and/or sold by the Company to any employee, director or consultant in such capacity.

**(ii)**"*Sale of the Company*"[1] shall mean (i) any consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if

---

[1] Note:  Revise as appropriate if the Company is not a corporation.

the surviving entity is a wholly owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; *provided, however*, that a Sale of the Company shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; or (iii) a sale, lease, exclusive license or other disposition of all or substantially all of the assets of the Company.

**4.Maturity.**   Unless this Note has been previously converted in accordance with the terms of Sections 3(a) through (c) above or satisfied in accordance with the terms of Section 3(d) above, the entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on the Maturity Date.

**5.Expenses.**   In the event of any default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by Holder in enforcing and collecting this Note.

**6.Prepayment.**   The Company may not prepay this Note prior to the Maturity Date without the consent of the Holder.

**7.Default.**   If there shall be any Event of Default hereunder, at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under Section 7(c) or 7(d)), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an Event of Default:

   **(a)**   The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

   **(b)**   The Company shall default in its performance of any covenant under the Agreement or any Note;

   **(c)**   The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

   **(d)**   An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

366742 v2/CO

**8.Waiver.** The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

**9.Governing Law.** This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

**10.Parity with Other Notes.** The Company's repayment obligation to the Holder under this Note shall be on parity with the Company's obligation to repay all Notes issued pursuant to the Agreement. In the event that the Company is obligated to repay the Notes and does not have sufficient funds to repay all the Notes in full, payment shall be made to the Holders of the Notes on a *pro rata* basis. The preceding sentence shall not, however, relieve the Company of its obligations to the Holder hereunder.

**11.Modification; Waiver.** Any term of this Note may be amended or waived with the written consent of the Company and the Holder.

**12.Assignment.** This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

[signature page follows]

**BABYWATCH, INC.**

By:_____

Name: Sandro Mur

Title: CEO


**SEMYON DUKACH**

By:_____

Name:_____

Title:_____

# Exhibit 3

## CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT

THIS CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT (the "*Agreement*") is made as of November 7, 2013 (the "*Effective Date*") by and among [BabyWatch Inc.] a Delaware corporation (the "*Company*"), and [CR Investments & Management UG (haftungsbeschränkt)] (the "*Purchaser*").

### RECITAL

A.     To provide the Company with resources to conduct its business, the Purchaser is willing to loan to the Company $20,000 (the "*Loan Amount*"), subject to the conditions specified herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and the Purchaser, intending to be legally bound, hereby agrees as follows:

### 1.     AMOUNT AND TERMS OF THE LOAN

1.1     **The Loan.** Subject to the terms of this Agreement, the Purchaser agrees to lend to the Company the Loan Amount against the issuance and delivery by the Company of a convertible promissory note for such amount, in the form attached hereto as EXHIBIT A (the "*Note*").

### 2.     CLOSING AND DELIVERY

2.1     **Closing.** The closing of the sale and purchase of the Note (the "*Closing*") shall be held on the Effective Date, or at such other time as the Company and Purchaser may mutually agree.

2.2     **Delivery.** At the Closing (i) the Purchaser shall deliver to the Company a check or wire transfer funds in the amount of the Loan Amount; and (ii) the Company shall issue and deliver to the Purchaser a Note in favor of the Purchaser payable in the principal amount of the Loan Amount.

### 3.     REPRESENTATIONS, WARRANTIES THE COMPANY

The Company hereby represents and warrants to the Purchaser as of the Closing as follows:

3.1     **Organization, Good Standing and Qualification.**[1]     The Company is a corporation duly organized, validly existing and in good standing under the laws of the

_____
[1]

State of Delaware. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business.

**3.2   Corporate Power.** The Company has all requisite corporate power to execute and deliver this Agreement, to issue the Note (collectively, the "*Loan Documents*") and to carry out and perform its obligations under the terms of the Loan Documents.

**3.3   Authorization.** All corporate action on the part of the Company, its directors and its stockholders necessary for the authorization of the Loan Documents and the execution, delivery and performance of all obligations of the Company under the Loan Documents, including the issuance and delivery of the Note and the reservation of the equity securities issuable upon conversion of the Note (the "*Conversion Securities*") has been taken or will be taken prior to the issuance of such Conversion Securities. The Loan Documents, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of the Loan Documents will be validly issued, fully paid and non assessable and free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

**3.4   Governmental Consents.** All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of the Company in connection with the valid execution and delivery of this Agreement, the offer, sale or issuance of the Note and the Conversion Securities issuable upon conversion of the Note or the consummation of any other transaction contemplated hereby shall have been obtained and will be effective at such time as required by such governmental authority.

**3.5   Compliance with Laws.** The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Company.

**3.6   Compliance with Other Instruments.** The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violations that would not individually or in the aggregate have an adverse effect on the Company. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated by the Loan Documents will not result in any such violation or be in

conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. The sale of the Note and the subsequent issuance of the Conversion Securities are not and will not be subject to any preemptive rights or rights of first refusal that have not been properly waived or complied with.

**3.7    Liabilities.**   The Company has no material liabilities and, to the best of its knowledge no material contingent liabilities, except current liabilities incurred in the ordinary course of business which have not been, either in any individual case or in the aggregate, materially adverse.

**3.8    Offering.**   Assuming the accuracy of the representations and warranties of the Purchaser contained in Section 4 hereof, the offer, issue, and sale of the Note and the Conversion Securities (collectively, the "***Securities***") are and will be exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "***Act***"), and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

**3.9    Use of Proceeds.**   The Company shall use the proceeds of sale and issuance of the Note for the operations of its business, and not for any personal, family or household purpose.

**3.10   Full Disclosure.**   To the Company's knowledge, there are no facts which (individually or in the aggregate) materially adversely affect the business, assets, liabilities, financial condition, prospects or operations of the Company that have not been disclosed in writing to the Purchaser.

**4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

**4.1    Purchase for Own Account.**   The Purchaser represents that it is acquiring the Securities solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**4.2    Information and Sophistication.**   Without lessening or obviating the representations and warranties of the Company set forth in Section 3, the Purchaser hereby: (i) represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and (ii) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**4.3   Ability to Bear Economic Risk**. The Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**4.4   Further Limitations on Disposition**.   Without in any way limiting the representations set forth above, the Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

**(a)**   There is then in effect a Registration Statement under the Act covering such proposed disposition and such disposition is made in accordance with such Registration Statement; or

**(b)**   The Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

**(c)**   Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by Purchaser to a member (or retired member) of Purchaser in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchaser hereunder.

**4.5   Accredited Investor Status.** The Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**5.   MISCELLANEOUS**

**5.1   Binding Agreement**.   The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**5.2   Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

**5.3   Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.4** **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**5.5** **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at the address on the signature page below, and to Purchaser at [ x ] or at such other addresses as the Company or Purchaser may designate by 10 days advance written notice to the other parties hereto.

**5.6** **Modification; Waiver.** No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective only upon the written consent of the Company and the Purchaser. Any provision of the Note may be amended or waived by the written consent of the Company and the Purchaser.

**5.7** **Expenses.** The Company and the Purchaser shall each bear its respective expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein.

**5.8** **Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Purchaser, upon any breach or default of the Company under the Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by Purchaser of any breach or default under this Agreement, or any waiver by any Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

**5.9** **Entire Agreement.** This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT as of the date first written above.

**Company:**

BabyWatch, Inc.

By:___
Name: Sandro Mur
Title: CEO___
Address:

One Commerce Center - 1201 Orange St. #600
Wilmington
New Castle County
Delaware 19899

IN WITNESS WHEREOF, the parties have executed this CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT as of the date first written above.

**PURCHASER:**

CR Investments & Management UG (haftungsbeschränkt)

By:___
Name: Helen Cao
Title: Managing Director

EXHIBIT A

FORM OF CONVERTIBLE PROMISSORY NOTE

# Exhibit 4

THIS CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE HOLDER SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

## CONVERTIBLE PROMISSORY NOTE

$20,000                                                         Date: November the 7th, 2013

For value received [BabyWatch Inc.] a Delaware corporation (the "*Company*"), promises to pay to [CR INVESTMENTS & MANAGEMENT UG (HAFTUNGSBESCHRÄNKT) ] or its assigns ("*Holder*") the principal sum of $20,000 together with accrued and unpaid interest thereon, each due and payable on the date and in the manner set forth below.

This convertible promissory note (the "*Note*") is issued pursuant to the terms of that certain Convertible Promissory Note Purchase Agreement (as amended, the "*Agreement*") dated as of November the 7th, 2013 (date).

1.**Repayment.** All payments of interest and principal shall be in lawful money of the United States of America. All payments shall be applied first to accrued interest, and thereafter to principal. The outstanding principal amount of the Loan shall be due and payable on the two year anniversary of this Note (the "*Maturity Date*").

2.**Interest Rate.** The Company promises to pay simple interest on the outstanding principal amount hereof from the date hereof until payment in full, which interest shall be payable at the rate of 5% per annum or the maximum rate permissible by law, whichever is less. Interest shall be due and payable on the Maturity Date and shall be calculated on the basis of a 365-day year for the actual number of days elapsed.

### 3.Conversion; Repayment Premium Upon Sale of the Company.

(a)In the event that the Company issues and sells shares of its Equity Securities to investors (the "*Investors*") on or before the date of the repayment in full of this Note in an arms-length equity financing resulting in gross proceeds to the Company of at least $500,000 (excluding the conversion of this Note and any other debt) (a "*Qualified Financing*"), then the outstanding principal balance of this Note shall automatically convert in whole without any further action by the Holder into such Equity Securities at a conversion price equal to the lesser of (i) 80% of the per share price paid by the Investors or (ii) the price equal to the quotient of $1,500,000 divided by the aggregate number of shares of the Company's Common Stock on a fully diluted basis as of immediately prior to the initial closing of the Qualified Financing. At the option of the

Holder, the Holder will receive all of the benefits afforded to the Investors in the Qualified Financing. Any unpaid accrued interest on this Note shall be converted into Equity Securities on the same terms as the principal of this Note.

(b)In the event that a Qualified Financing is not consummated prior to the Maturity Date, then, at the written election of the Holder made at least five days prior to the Maturity Date, effective upon the Maturity Date, the outstanding principal balance and any unpaid accrued interest under this Note shall be converted into shares of Common Stock of the Company at a conversion price equal to the quotient of S1,500,000 divided by the aggregate number of outstanding shares of the Company's Common Stock as of the Maturity Date (assuming full conversion or exercise of all convertible and exercisable securities then outstanding other than this Note).

(c)If the conversion of the Note would result in the issuance of a fractional share, the Company shall, in lieu of issuance of any fractional share, pay the Holder otherwise entitled to such fraction a sum in cash equal to the product resulting from multiplying the then current fair market value of one share of the class and series of capital stock into which this Note has converted by such fraction.

(d)Notwithstanding any provision of this Note to the contrary, if the Company consummates a Sale of the Company (as defined below) prior to the conversion or repayment in full of this Note, then (i) the Company will give the Holder at least five days prior written notice of the anticipated closing date of such Sale of the Company and (ii) at the closing of such Sale of the Company, in full satisfaction of the Company's obligations under this Note, the Company will pay the Holder an aggregate amount equal to the greater of (x) the aggregate amount of principal and interest then outstanding under this Note or (y) the amount the Holder would have been entitled to receive in connection with such Sale of the Company if the aggregate amount of principal and interest then outstanding under this Note had been converted into shares of Common Stock of the Company pursuant to Section 3(b) immediately prior to the closing of such Sale of the Company.

(e)For purposes of this Note:

(i)"*Equity Securities*" shall mean the Company's capital stock or any securities conferring the right to purchase the Company's capital stock or securities convertible into, or exchangeable for (with or without additional consideration), the Company's capital stock, except that such defined term shall not include any security granted, issued and/or sold by the Company to any employee, director or consultant in such capacity.

(ii)"*Sale of the Company*"[1] shall mean (i) any consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the

---
[1] Note: Revise as appropriate if the Company is not a corporation.

annenamie.

stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; *provided, however,* that a Sale of the Company shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or Indebtedness of the Company is cancelled or converted or a combination thereof; or (iii) a sale, lease, exclusive license or other disposition of all or substantially all of the assets of the Company.

**4.Maturity.** Unless this Note has been previously converted in accordance with the terms of Sections 3(a) through (c) above or satisfied in accordance with the terms of Section 3(d) above, the entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on the Maturity Date.

**5.Expenses.** In the event of any default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by Holder in enforcing and collecting this Note.

**6.Prepayment.** The Company may not prepay this Note prior to the Maturity Date without the consent of the Holder.

**7.Default.** If there shall be any Event of Default hereunder, at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under Section 7(c) or 7(d)), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an Event of Default:

(a)     The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b)     The Company shall default in its performance of any covenant under the Agreement or any Note;

(c)     The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

3.

(d)    An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

**8. Waiver.**  The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

**9. Governing Law.**  This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

**10. Parity with Other Notes.**  The Company's repayment obligation to the Holder under this Note shall be on parity with the Company's obligation to repay all Notes issued pursuant to the Agreement. In the event that the Company is obligated to repay the Notes and does not have sufficient funds to repay all the Notes in full, payment shall be made to the Holders of the Notes on a *pro rata* basis. The preceding sentence shall not, however, relieve the Company of its obligations to the Holder hereunder.

**11. Modification; Waiver.**  Any term of this Note may be amended or waived with the written consent of the Company and the Holder.

**12. Assignment.**  This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

[signature page follows]

**BABYWATCH, INC.**

By:

Name: Sandro Mur

Title: CEO


**CR INVESTMENTS & MANAGEMENT UG (HAFTUNGSBESCHRÄNKT)**

By:

Name: Helen Yuanyuan Cao

Title: Managing Director

# Exhibit 5

*BabyWatch, Inc.*

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (the "Agreement") is made as of October 1, 2013, by and between *BabyWatch, Inc.*, a Delaware corporation (the "Company"), and SBC Berlin Ltd., a limited liability company established under the laws of England and Wales (the "Purchaser").

RECITALS

A.     The Company desires to issue and sell the Shares (as defined in Section 1 below) to Purchaser, and Purchaser desires to purchase the Shares from the Company.

B.     The Company's Board of Directors (the "Board") unanimously approved the issuance and sale of the Shares to Purchaser on September 30, 2013.

AGREEMENT

NOW THEREFORE, the undersigned agree as follows:

1.     **Sale of Stock.**  Subject to the terms and conditions of this Agreement, on the Purchase Date (as defined below) the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, 800,000 shares of the Company's Common Stock (the "Shares") at a purchase price of EUR 0.01875 per Share for a total purchase price of EUR 15,000 (the "Aggregate Purchase Price").  The term "Shares" refers to the purchased Shares and all securities received in replacement of or in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other properties to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.     **Consideration for shares.**  As consideration for the Shares, Purchaser will deliver the Aggregate Purchase Price by a check made out to the Company.

3.     **Purchase.**  The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date").  On the Purchase Date, the Company will deliver to Purchaser a certificate representing the Shares to be purchased by Purchaser (which shall be issued in Purchaser's name).

4.     **Limitations on Transfer.**  In addition to any other limitation on transfer created by applicable securities laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

(a)     **Right of First Refusal.** Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(a) (the "Right of First Refusal").

AF

(i)    **Notice of Proposed Transfer.**  The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating:  (A) the Holder's bona fide intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer.  The Holder shall offer the Shares at the same price (the "Offered Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii)    **Exercise of Right of First Refusal.**  At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (iii) below.

(iii)    **Purchase Price.**  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 3(a) shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith.

(iv)    **Payment.**  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(v)    **Holder's Right to Transfer.**  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(a), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 60 days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(b)    **Involuntary Transfer.**

(i)    **Company's Right to Purchase upon Involuntary Transfer.**  In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer of all or a portion of the Shares by the record holder thereof, the Company shall have the right to purchase all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the fair market value of the Shares on the date of transfer.  Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer.  The right to purchase such

2



Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice by the person acquiring the Shares.

(ii)     **Price for Involuntary Transfer.**  With respect to any stock to be transferred pursuant to Section 3(b)(i), the price per Share shall be a price set by the Board of Directors of the Company that will reflect the current value of the stock in terms of present earnings and future prospects of the Company.  The Company shall notify Purchaser or his or her executor of the price so determined within 30 days after receipt by it of written notice of the transfer or proposed transfer of Shares.  However, if Purchaser does not agree with the valuation as determined by the Board of Directors of the Company, Purchaser shall be entitled to have the valuation determined by an independent appraiser to be mutually agreed upon by the Company and Purchaser and whose fees shall be borne equally by the Company and Purchaser.

(c)     **Assignment.**  The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any stockholder or stockholders of the Company or other persons or organizations.

(d)     **Restrictions Binding on Transferees.**  All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement.  Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(e)     **Termination of Rights.**  The Right of First Refusal in Section 3(a) and the Company's right to repurchase the Shares in the event of an involuntary transfer pursuant to Section 3(b) above shall terminate upon the earliest to occur of (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), (ii) sale of substantially all the assets of the Company, (iii) a merger in which the Company is not the survivor, or (iv) acquisition of a majority of the outstanding securities of the Company by a single person or entity.

(f)     **Market Standoff Agreement.**  In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing such offering of the Company's securities, Purchaser agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering; provided, however, that all offers and directors of the Company must execute substantially identical agreements.

5.     **Investment and Taxation Representations.**  In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)     Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Purchaser is purchasing the Shares for investment

3

for its own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)    Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Purchaser acknowledges that the Company has no obligation to register or qualify the Shares for resale. Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

(d)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(e)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 5(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 5(e) below.

(e) Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

4

AP

6. **Lock-up Agreement**. If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

7. **Restrictive Legends and Stop-Transfer Orders.**

(a) **Legends.** The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i) THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii) THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(b) **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

5

AF

(d)  **Removal of Legend.**  When all of the following events have occurred, the Shares then held by Purchaser will no longer be subject to the legend referred to in Section 5(a)(ii):  (i) the termination of the Right of First Refusal; and (ii) the expiration or termination of the market standoff provisions of Section 3(f) (and of any agreement entered pursuant to Section 3(f)).  After such time, and upon Purchaser's request, a new certificate or certificates representing the Shares not repurchased shall be issued without the legend referred to in Section 5(a)(ii), and delivered to Purchaser.

8.    **No Continuing Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or subsidiary of the Company, to terminate Purchaser's consulting relationship, for any reason, with or without cause.

9.    **Miscellaneous.**

(a)  **Governing Law.**  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

(b)  **Entire Agreement; Enforcement of Rights.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c)  **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d)  **Construction.**  This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(e)  **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by telegram or fax or 48 hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address or fax number as set forth below or as subsequently modified by written notice.

(f)  **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

AF

(g)    **Successors and Assigns.**  The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns.  The rights and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

[Signature Page Follows]

7

AF

The parties have executed this Agreement as of the date first set forth above.

**BabyWatch, Inc.**

By: _____

Name: Sandro Mur

Title: _____

Address: 268 Greens Farm Rd. Branford, CT 06405, USA

_____

**PURCHASER:**

**SBC BERLIN ~~LTD.~~** 2012 - 2014 Ltd

By: _____

Name: ALEX FARCET

Title: MANAGING DIRECTOR

Address: 1 St. Katherine's Way London E1W 1UN ENGLAND

8